UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

NAUTICAL ASSIST, INC.,                      :
                                            :
                            Plaintiff,      :
                                            :        MEMORANDUM & ORDER
            -against-                       :
                                            :        17-CV-5435 (ENV) (ARL)
BEVERLY ALLAN as EXECUTRIX for the          :
ESTATE of MICHAEL J. ALLAN, PATCHOGUE :
SHORES MARINA, INC., RICK MARINO, JUAN :
C. RODRIGUEZ, UDO SCHNEIDER, DAVID          :
TOMO, CHARLES VANEK, ERICK VANEK,           :
and ELIZABETH GIUNTA,                       :
                                            :
                            Defendants.     :

------------------------------------------------------------ x

VITALIANO, D.J.

On September 15, 2017, plaintiff Nautical Assist, Inc. ("Nautical") commenced this action

to recover costs associated with a clean-up operation at a marina in East Patchogue on Long Island,

asserting a variety of claims against a litany of defendants. Consistent with the ordinary

winnowing of parties and issues in the course of litigation, yet to be resolved are two of Nautical's

claims: first, an Oil Pollution Act ("OPA") claim against defendant Beverly Allan, acting as the

executrix for the estate of Michael J. Allan (the "Executrix")[1]; and second, in the alternative, a

breach-of-contract claim against defendant Patchogue Shores Marina, Inc. ("Patchogue").[2]

---

[1] The target of the OPA claim was originally Allan himself. However, following Allan's death, the Executrix was substituted for Allan in accordance with Federal Rule of Civil Procedure 25 and stands in his shoes for purposes of this litigation.

[2] One other claim remains technically open. Defendant Juan C. Rodriguez has never appeared, and the December 31, 2022 Memorandum & Order that dismissed all other similarly-situated defendants did not formally dispose of Nautical's claim against him. However, Nautical agreed in the Joint Pre-Trial Order, so-ordered on July 30, 2024, that the third cause of action listed in its amended complaint (i.e., the one asserted against Rodriguez) was "not to be tried" when all other remaining issues were to be tried. Joint Pre-Trial Order ("JPTO"), Dkt. No. 185, at 3. By doing

Patchogue also maintains a cross-claim against the Executrix in the event that Nautical proves successful on its contract claim.[3]

Trial in this case began before the Court, sitting without a jury, on September 17, 2024 and concluded, following a year-long adjournment to allow for the substitution of Allan's daughter as executrix, on February 13, 2026.  Having heard and considered the testimony of the witnesses, reviewed the exhibits received in evidence, and considered the arguments of counsel, this Memorandum & Order, pursuant to Federal Rule of Civil Procedure 52, constitutes the Court's findings of fact and conclusions of law.[4]

<u>The Facts</u>

On August 16, 2016, one of the vessels docked at the Patchogue marina caught fire.[5]  JPTO 6; Tr. 711:20-712:1.  That vessel was Michael Allan's boat, a 40-foot-long Tollycraft known as the "Allan's Alley."  JPTO 6; Tr. 712:2-10.  The Allan's Alley, at the time of the fire, contained approximately 180 gallons of diesel fuel in its fuel tank.  JPTO 6; Tr. 270:10-12.  The fire swept through the marina, setting aflame and completely destroying, along with the Allan's Alley, six other gasoline-powered vessels anchored nearby.  Tr. 84:16-17, 237:14-20.  Upon noticing smoke from the fire, Captain David Kazmark, the owner of Patchogue, called 911.  *Id.* 711:11-13, 712:11-

---

so, Nautical withdrew its claim against Rodriguez, which has otherwise managed to sail on like a ghost ship never finding port.  *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007).

[3] The exact nature of this cross-claim is, even after trial, unclear, but that is, in any event, a moot issue in light of the other post-trial dispositions.

[4] The Court's ruling on the parties' motions for judgment as a matter of law, made pursuant to Rule 52(c), is subsumed within this Memorandum & Order.  *See Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 433 (S.D.N.Y. 2004).

[5] The marina abuts a creek which leads into the Great South Bay.  Tr. 183:2-3; Pl.'s Ex. 1C, Dkt. No. 260-1, at 3.

2

12.  News crews and firemen then descended on the scene.  *Id.* 713:4.

Nautical also soon arrived.  Tr. 61:3-9; Pl.'s Ex. 1WW, Dkt. No. 260-4, at 1-2.  One of the franchisees of a corporation called Sea Tow Services International, Inc., it provides salvage assistance and other maritime services to boatowners in the Great South Bay off the coast of Long Island.  Tr. 28:4-10, 28:22-29:9.  Following privatization of certain United States Coast Guard ("USCG") functions, Nautical can act as a substitute for USCG in non-emergency search and rescue situations.  *Id.* 35:15-21, 115:13-116:9.

Captain Ryan Bayley, the owner of Nautical, first learned of the fire after receiving a call from Captain Alan Bregman, the head of a neighboring franchisee called Sea Tow Freeport.  Tr. 27:25-28:3, 58:16-25.  He sent his manager, Captain Joseph Haskell, to investigate around 9:15 p.m. on the night of the fire.  *Id.* 61:1-9; Pl.'s Ex. 1WW at 1.  Once Captain Bayley and his team had made an assessment of the scene, Captain Haskell engaged in preliminary discussions with Captain Kazmark about the possibility of Nautical responding.  Tr. 175:18-176:5, 716:17-21; Pl.'s Ex. 1WW at 3.

The next morning, Nautical's crew returned to the marina and surveyed the damage inflicted by the fire.  Tr. 192:11-14; Pl.'s Ex. 1WW at 6.  Many of the fire-damaged vessels had burned completely to the waterline.  Tr. 79:21-23; *see* Pl.'s Ex. 1Z, Dkt. No. 260-2, at 10.  Some had sunk, in part due to the amount of water sprayed on the vessels while the firemen were attempting to extinguish the fire.  Tr. 179:5-11; *see* Pl.'s Ex. 1Y, Dkt. No. 260-2, at 9.  Wreckage from the fire-damaged vessels had drifted away from the dock.  Tr. 179:13-16.  In addition, long stretches of the dock had turned black from the flames, and entire planks were missing.  Pl.'s Ex. 1FF, Dkt. No. 260-2, at 16.

While the gasoline from the six gasoline-powered vessels had burned off during the fire, a

3

small amount of diesel fuel, which is typically dyed red and does not burn off like gasoline, had leaked from the fuel tank of the Allan's Alley. *See* JPTO 6; Tr. 84:16-19, 85:21-87:9. Hydraulic, steering, and transmission fluids and oil from the engine blocks of each of the seven boats may have also escaped after the plastic caps and fittings on the boats' internal systems had melted. Tr. 179:23-180:13, 251:6-22. No measurement of the total amount of oil discharged was ever made. *Id.* 557:16-19.

Before providing any remedial services, Captain Bayley met with Captain Kazmark to discuss the services that Nautical could provide. Tr. 487:3-20; Pl.'s Ex. 1WW at 6. That afternoon, or the next day, the two continued their conversations and orally came to an agreement as to how Nautical would be compensated for its work. Tr. 489:3-7, 713:5-714:1. Under that agreement, rather than charging the marina, Nautical was to bill the boatowners' insurance companies directly; in addition, as with all other outside vendors, Nautical had to tender 10% of whatever it received to the marina. *Id.* 489:15-22, 713:17-714:9. Captain Bayley claimed that Captain Kazmark had also agreed that, to the extent that any of the insurance companies refused to pay, the marina would make up the resulting shortfall in Nautical's bill-collection efforts. *Id.* 489:23-25. In his testimony at trial, however, Captain Kazmark flatly denied Captain Bayley's claims. *Id.* 720:14-17.

But, the first round of discussions between the two captains was not the only round. Captain Kazmark followed up with Captain Bayley on August 18, 2016, handing him a letter claiming to confirm their prior conversations. Tr. 492:4-9; Def.'s Ex. 1, Dkt. No. 260-18. That document, while reiterating that Nautical was to invoice the boatowners and their insurers directly, did not mention any other aspect of the agreement between Patchogue and Nautical. *See* Def.'s Ex. 1. Over the next few days, Nautical did contact the individual boatowners' insurance representatives and obtain their approval to remove the wreckage of the burned vessels. Tr. 440:4-

4

441:5, 493:3-16.  In line with the captains' earlier discussions, Nautical also later sent Patchogue a check for 10% of the payment it had received from three of the boatowners, Giunta, Tomo, and Marino, for its wreck removal services.  *Id.* 496:12-21, 717:14-19; Pl.'s Ex. 14, Dkt. No. 260-13.

The morning after the fire, August 17, 2016, clean-up activities would kick into high gear. A key component in the clean-up plan, Nautical launched its remedial services after Captain Bayley had wrapped up his initial conversation with Captain Kazmark.  Pl.'s Ex. 1WW at 6.  By then, USCG and New York's Department of Environmental Conservation ("DEC") had also arrived to oversee the containment and removal of any pollution caused by the fire.  JPTO 6; Tr. 180:22-181:6, 191:23-192:18, 696:16-697:4.  To that end, USCG personnel handed out "Notices of Federal Interest" ("NOFIs") to each of the boatowners involved in the fire, alerting them to the fact that an oil pollution incident had occurred or threatened to and that they may face penalties if they fail to take action.  Tr. 484:13-21; Pl.'s Ex. 9, Dkt. No. 260-10.  USCG did not ever, in the words of Captain Bayley, "federalize[] the job" though and, consequently, did not issue to Nautical any authorization to proceed under the authority of the National Contingency Plan ("NCP"), which is the federal government's regulatory blueprint for responding to discharges of oil and other pollutants.  Tr. 558:17-21, 694:10-20; 40 C.F.R. § 300.1.

In coordination with USCG and DEC, Nautical established four containment zones around the debris and miscellaneous contaminants in the water and two land-based waste disposal areas. Tr. 181:17-183:6, 223:14-20; Pl.'s Ex. 1WW at 7-8; *see* Pl.'s Ex. 1GG, Dkt. No. 260-2, at 17; Pl.'s Ex. 1QQ, Dkt. No. 260-3, at 10.  To do so, Nautical deployed hard and soft boom around the perimeter of the containment zones and deposited sorbent pads throughout.[6]  Tr. 190:11-191:19;

---

[6] Hard boom acts as a barrier; it is made out of plastic and has a skirt that descends 12 inches to trap pollutants.  Tr. 89:18-90:1, 194:10-15.  Soft boom, also known as "sausage boom," on the

*see* Pl.'s Ex. 1J, Dkt. No. 260-1, at 10.  It also built out the waste disposal areas using plastic tarp, sorbent mats, and sorbent pads and enclosed each with soft boom.  Tr. 225:18-228:10; *see* Pl.'s Ex. 1I, Dkt. No. 260-1, at 9.

On the same day, Nautical started to sweep the harbor for floating pieces of charred debris and to haul vessel wreckage out of the water.  Tr. 236:8-14; Pl.'s Ex. 1WW at 8.  Some of the removed wreckage was no bigger than a nickel or a dime; these small pieces of fiberglass, wood, and plastic—referred to as "popcorn"—were covered in pollutants.  Tr. 245:24-246:1, 256:22-257:5; *see* Pl.'s Ex. 1E, Dkt. No. 260-1, at 5.  Wreck removal efforts continued apace on August 18, 2016, along with the replacement of sorbent materials as needed.  Tr. 240:6-241:8; Pl.'s Ex. 1WW at 13-15.  Once on land, at least one of the vessels had to be drained of its oil by the marina, which pumped an unknown quantity of oil from the vessel into a large oil drum.  Tr. 391:13-392:25; Pl.'s Ex. 1W, Dkt. No. 260-2, at 7.  By the end of the day on August 19, 2016, only the Allan's Alley was left in the water, and three of the four containment zones had been fully decontaminated and secured.  Tr. 246:21-25, 258:1-259:14; Pl.'s Ex. 1WW at 21-23.

Separately, the parties began to address financial responsibility for the damage caused by the fire, and the boatowners' insurance representatives started to trickle in.  Tr. 440:22-441:5.  On behalf of the boatowners, they entered into negotiations with Nautical regarding the removal of the destroyed vessels.  *Id.*  None of the resulting agreements was in writing.  *Id.* 441:21-22.  One of the first to arrive was Ken Weinbrecht, a marine surveyor hired by the insurance company BoatUS on behalf of Allan.[7]  *Id.* 440:11-17, 629:5-7.  Captain Bayley and Weinbrecht settled on

---

other hand, absorbs oils while repelling water.  *Id.* 194:16-18.  Sorbent pads function like soft boom and soak up oils.  *Id.* 194:19-22.

[7] Like insurance adjusters, marine surveyors investigate insurance claims for marine insurers.  Tr. 659:3-660:10.

a price of $24,000 for the removal of the Allan's Alley. *Id.* 443:23-444:3; *see* Pl.'s Ex. 3, Dkt. No. 260-6, at 3. Unlike the other vessels, this price was not calculated on a "per-foot" basis; instead, it was simply one both parties were "comfortable" with.[8] Tr. 444:2-7.

With an investigation by the insurance companies and Suffolk County arson squad into the origin of the fire on the Allan's Alley underway, Nautical was told not to take the Allan's Alley out of the water at the same time as the other vessels. Tr. 239:4-20, 438:7-25. The inspection of the boat was delayed several times, but finally, four days after the fire, Nautical was notified that the inspection would move forward on August 22, 2016. *Id.* 263:7-15; Pl.'s Ex. 1WW at 31.

On that day, fire investigators and marine surveyors gathered at the marina. *See* Tr. 624:10-629:11. One of the attendees was Joseph Federici, Allan's attorney. *Id.* 623:19-21, 633:3-10. Using two cranes operated by a subcontractor, one on land and one on a barge, Nautical moved the Allan's Alley around the corner of the dock and lifted it partially out of the water so that the investigators could observe it more closely. *Id.* 286:23-289:1, 293:2-8, 296:4-13. The assembled investigators concluded that a more thorough assessment of the Allan's Alley was impractical, if not impossible, given the fragile condition of the vessel and reached an agreement, memorialized in a writing prepared by Federici, to extract the submerged remains of the Allan's Alley piece by piece with an excavator. *Id.* 635:25-636:22; Pl.'s Ex. 12, Dkt. No. 260-11. No other removal method was deemed feasible, and the fuel tank could not otherwise be safely accessed according to Nautical's licensed divers. Tr. 300:15-302:10. When the excavator began to break up the Allan's Alley, the fuel tank ruptured, releasing approximately 180 gallons of diesel fuel. JPTO 6; Tr. 640:7-17; Pl.'s Ex. 15-3, Dkt. No. 260-14, at 3. No diesel fuel escaped the containment area,

---

[8] Typically, wreck removal fees are computed on a "per-foot" basis, meaning that the price for the removal and disposal of the wreck depends on the length of the ship from bow to stern. Tr. 444:8-25.

and the removal of the Allan's Alley carried on for the rest of the day.  Pl.'s Ex. 1WW at 38-39.

Over the next two days, Nautical fished out the remaining debris and dismantled the land-based waste disposal areas.  Pl.'s Ex. 1WW at 42-43, 46-47.  Nautical also arranged for the pick-up of the 17 55-gallon drums that it had filled with debris and various contaminants.  Tr. 241:19-23; Pl.'s Ex. 1WW at 46-47.  Eastern Environmental Solutions, Inc. ("Eastern Environmental"), a company doing business in the field of hazardous waste disposal, collected the drums on September 2, 2016.  Tr. 323:1-324:1; Pl.'s Ex. 13, Dkt. No. 260-12.  The pick-up on September 2, 2016 was the last time that any drums filled with oil-soaked materials, gathered as part of the clean-up operation at the marina, were hauled away by any company.  *See generally* Pl.'s Ex. 1WW; *see also* Pl.'s Ex. 13.

Meanwhile, on August 25, 2016, Nautical informed USCG that the clean-up operation had been completed but that, due to the damage sustained by the marina's dock and bulkhead, the hard boom would stay in the water and a containment watch schedule would be implemented.  Tr. 326:4-11, 327:8-12; Pl.'s Ex. 1WW at 49-50.  Captain Bayley claimed, during his testimony, that Nautical had to take these steps because pollutants were continuing to emanate from the dock and bulkhead, which had allegedly become saturated with oil following the fire.  Tr. 318:1-11.  Starting on August 26, 2016, Nautical instituted a bi-daily watch schedule, whereby its employees would visit the marina twice a day to monitor and adjust the hard boom.  Tr. 600:1-3; Pl.'s Ex. 1WW at 52-125.  That timetable was tweaked, as necessary, to account for extreme weather and variations in tidal patterns.  Tr. 329:1-331:16.  Nautical scaled back its watch schedule to bi-monthly inspections after October 1, 2016; that set-up lasted until March 31, 2017.  *Id.* 600:6-11; Pl.'s Ex. 1WW at 126-155.

In the middle of March 2017, Patchogue obtained the government permits needed to

reconstruct the dock and bulkhead.  Tr. 723:17-25, 724:15-17.  Due to a timing issue, construction could not begin immediately.  *Id.* 724:17-18.  But, once that hiccup was over and the old dock had at last been replaced, Nautical pulled the hard boom out of the water and ceased operations at the marina on April 24, 2017.  *Id.* 93:3-9, 349:18-350:16; Pl.'s Ex. 1WW at 157-58.

Nautical sent Allan, and the other boatowners, a series of bills.  The first of Allan's bills showed up on September 1, 2016 for the "Wreck Removal Project of the M/V 'Allan's Alley.'" Pl.'s Ex. 3, at 2-3.  This invoice demanded $24,000 for the services rendered by Nautical, which matched the price agreed upon by Captain Bayley and Weinbrecht, along with $2,070 in sales tax. *Id.*  It was promptly paid.  Tr. 447:5-17.  Between then and December 2016, Captain Bayley had no contact with Allan or anyone at BoatUS and was not aware of his then-retained counsel engaging in any communications with them either.  *Id.* 591:24-592:18.

Three environmental remediation bills then followed, beginning on December 12, 2016. *See* Def.'s Ex. A-1, Dkt. No. 260-15; Def.'s Ex. A-2, Dkt. No. 260-16; Def.'s Ex. A-3, Dkt. No. 260-17.  Nautical's attorney at the time issued the bills to Allan on behalf of Nautical.  Tr. 449:9-450:20.  The first invoice, charged on a time-and-material basis[9] and ostensibly covering the period of August 16, 2016 to September 30, 2016, demanded $282,627.30.  Def.'s Ex. A-2, at 1-2.  Later, without any explanation, it was revised on April 17, 2017; this updated invoice reduced the price listed for certain materials but applied a General & Administrative ("G&A") rate of 15%[10] to the amount charged for materials.  *See* Def.'s Ex. B, Dkt. No. 260-21, at 3-5.  The second invoice,

---

[9] Nautical's time-and-material bill charged for not only single-use materials but also reusable equipment.  Tr. 219:9-18.

[10] G&A usually stands in for any indirect costs incurred during a job, such as rent, utilities, and insurance.  Tr. 461:3-9.  Nautical's rate sheet indicates that it charges 15% for G&A; it does not suggest that G&A can be higher than 15%.  *Id.* 463:9-12, 464:8-10; Def.'s Ex. 4, Dkt. No. 260-20, at 3.

9

encompassing the period of the containment watch schedule (October 1, 2016 to March 31, 2017), added $54,062.66 to the tally.  Def.'s Ex. A-2, at 3.  The third, issued by Nautical on April 28, 2017, finished out the count with an additional $6,210 for the period of April 1, 2017 to April 24, 2017.  Def.'s Ex. A-3.

When Allan refused to pay the three environmental bills, Nautical brought this lawsuit on September 15, 2017, originally against Allan alone.  Tr. 452:9-12; Compl., Dkt. No. 1.  It then sent out a "final" invoice to Allan, the other boatowners, and Patchogue on May 17, 2018.  Tr. 454:11-18, 456:1-6.  This invoice stated that each of the recipients owed Nautical $436,712.15—$335,947.81 for the environmental services and equipment provided from August 16, 2016 to April 24, 2017 and $100,784.34 for Nautical's general and administrative costs, calculated at a 30% G&A rate.  *See* Pl.'s Ex. 4, Dkt. No. 260-7.  Nautical amended its complaint on November 13, 2018 to reflect this change in the sum demanded and to join Patchogue and the other boatowners as defendants.  Am. Compl., Dkt. No. 25.  On the stand during trial, Captain Bayley made further corrections to the billing.  *See* Tr. 345:23-346:23.

Discussion

I.    OPA

OPA, enacted in the aftermath of the *Exxon Valdez* oil spill as an amendment to the Clean Water Act, "is the primary federal legislation addressing oil spills into [the] navigable waters of the United States and onto its shorelines."  *Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. United States*, 489 F. Supp. 3d 106, 110 (E.D.N.Y. 2020).  Under OPA, "each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages . . . that result from such incident."  33

10

U.S.C. § 2702(a).  The statute imposes a strict liability standard; moreover, when there are multiple responsible parties, liability is joint and several.  *In re Petition of Settoon Towing LLC*, 722 F. Supp. 2d 710, 714 (E.D. La. 2010).  To recover against an alleged responsible party under OPA, a claimant must meet the preponderance-of-the-evidence standard.  *See Hoffer v. Tellone*, 128 F.4th 433, 439 (2d Cir. 2025) ("[W]e presume that [the preponderance-of-the-evidence] standard is applicable in civil actions between private litigants unless particularly important individual interests or rights are at stake." (quoting *Grogan v. Garner*, 498 U.S. 279, 286 (1991)) (internal quotation marks omitted)).

Though the parties have engaged in prolonged argument regarding the liability of Allan's estate and his executrix under OPA for Nautical's oil spill remediation billing, the Court finds the argument academic.  The Court concludes that whether or not the estate would be subject to OPA liability for the oil spilled due to the fire on August 16, 2016, any right to recovery is foreclosed because Nautical was compensated in full for all costs related to the removal of the wreckage of Allan's vessel from the water, as part of the fixed-price wreck removal agreement that it had entered into with the marine surveyor Weinbrecht, who had been hired by BoatUS to represent Allan.

The Court's conclusion that Nautical's claim against Allan's estate is foreclosed by contract does not end the inquiry.  It simply engenders further inquiry.  Specifically, it is necessary to determine whether the wreck removal agreement qualifies as a "maritime contract."  If it does, and the dispute is not inherently local, then general maritime law, a form of federal common law, applies when interpreting its terms.  *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 22-23 (2004).  In order to decide whether a contract is a maritime one, courts take a "conceptual approach"; the inquiry focuses on whether the contract has "reference to maritime service or maritime

11

transactions" and whether its "principal objective" is "maritime commerce." *Id.* at 24-25 (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.,* 249 U.S. 119, 125 (1919)) (internal quotation marks omitted).

In the words of Justice Harlan, the contract here clearly has a "genuinely salty flavor" to it. *Kossick v. United Fruit Co.*, 365 U.S. 731, 742 (1961). What could be more "maritime" than an agreement to remove the wreckage of a sea-faring vessel from the waters of an active marina? The fact that the Allan's Alley burned in its slip, mere feet from land, or that it functioned only as a pleasure yacht, never transporting any goods between ports, does not make this agreement any less "maritime." Nor does it make this dispute an "inherently local" one, thus requiring the application of New York state law. "[W]hen state interests cannot be accommodated without defeating a federal interest, . . . then federal substantive law should govern." *Norfolk*, 543 U.S. at 27. This agreement implicates, and in fact directly affects, the core of OPA's federal liability regime; as such, the interpretation of this agreement, and others like it, cannot be left to the states to manage. Uniformity of meaning is key, and federal common law must therefore control, to the extent that it exists. In the absence of an established maritime rule, however, state law can be used to fill the ensuing gap. *See Great Lakes Ins. SE v. Raiders Retreat Realty Co.*, 601 U.S. 65, 70 (2024).

General maritime law, thankfully, is not as alien as some of the creatures that dwell in the depths of the sea. Indeed, "[m]aritime contracts 'must be construed like any other contracts: by their terms and consistent with the intent of the parties.'" *CITGO Asphalt Refin. Co. v. Frescati Shipping Co.*, 589 U.S. 348, 355 (2020) (quoting *Norfolk*, 543 U.S. at 31). "Where the words of a contract . . . are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Id.* (quoting *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435

(2015)) (internal quotation marks omitted).  "But [w]hen a . . . contract is ambiguous, its meaning is a question of fact, requiring a determination of the intent of [the] parties in entering the contract; that may involve examining relevant extrinsic evidence of the parties' intent and the meaning of the words that they used."  *Id.* (quoting 11 Williston on Contracts § 30:7 (4th ed.)) (internal quotation marks omitted).

Very little is known about the terms of this oral agreement, other than the fact that it concerns "wreck removal."  *See* Tr. 441:16-22.  But that only begs the question: what exactly is "wreck removal"?  The term is not one found in common parlance, though Nautical and Weinbrecht evidently understood what it meant when they came to their agreement.  That suggests that the expression derives its origin from the jargon of the maritime industry.  In such circumstances, courts construing the terms of these arrangements can turn to extrinsic evidence of custom and usage to interpret the provisions of ambiguous maritime contracts.  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 674 n.6 (2010).

Within the maritime industry, according to the uncontested and highly credible testimony of expert witness John C. Lane,[11] it is customary for wreck removal agreements to cover the clean-up of small quantities of oil discharged by the wreck.[12]  Tr. 691:25-692:11.  "Wreck removal,"

---

[11] In formulating his testimony, Lane drew on his decades-long experience in the field of maritime pollution and oil spill response.  *See* Tr. 655:23-658:18, 661:12-663:8.

[12] Lane's testimony does suffer at times from inexact wording, but that minor defect alone does not impact the Court's assessment of his otherwise-credible testimony.  The haziness stems from the overlap between two distinct, but related, issues: (1) the legal trigger for liability under OPA; and (2) the threshold at which USCG would direct a more substantial oil pollution response above and beyond ordinary wreck removal services.  *See* Tr. 697:15-21.  OPA's liability standard is strict, and as a result, there is no "de minimis" exception to its reach.  *See United States v. Kilroy & Assocs., Inc.*, No. C08-1019-JCC, 2009 WL 3633891, at *4 (W.D. Wash. Oct. 30, 2009).  Lane's testimony that a "de minimis" spill would not prompt an oil pollution response by USCG is not to the contrary.  *See* Tr. 682:14-20, 697:15-21.  Under the relevant regulations, USCG enjoys wide-ranging discretion on how to best handle a reported discharge and, where USCG officers have

according to Lane, encompasses the extraction and disposal of *all* debris.  *Id.* 686:4-18.  When only a minimal amount of oil has spilled, and USCG has not seen fit to direct a more expansive oil spill response, that includes oil-saturated materials and even oil fluids themselves.  *Id.* 682:14-20, 686:19-687:20, 743:2-24.

Grounded in the actions of the parties, those employed by them and working in consort with them, the representatives of those insuring them, and USCG and DEC officials, the Court finds the testimony of Lane material and credible.  This evidence, along with the opinion offered by Lane, supports the Court's conclusion that, as a result of the fire aboard the Allan's Alley, only a marginal quantity of oil spilled and the price agreed upon in the contract for wreck removal subsumed the oil clean-up costs made recoverable under OPA.[13]  *See* Tr. 691:15-21, 743:2-24, 752:11-20.

Drilling further down on that evidence, even accounting for the rupture of the fuel tank on the Allan's Alley on August 22, 2016, the actual quantity of oil discharged due to the fire was negligible, and it would have been functionally impossible for what little oil was spilled to have been removed independently from the wreckage of the vessels.  That goes for both the larger pieces

---

identified only a "minor discharge," can opt to simply "monitor the situation to ensure that proper removal action is being taken."  40 C.F.R. § 300.320.  OPA's benchmark for liability therefore differs from the threshold at which USCG may order a more significant oil pollution response— and the latter, according to Lane, is what is important for determining the scope of a wreck removal contract.  OPA, after all, says nothing as to how such contracts ought to be interpreted.  *See generally* 33 U.S.C. § 2701 et seq.; *see also* Tr. 751:20-23.

[13] The Southern District of Georgia case that Nautical relies upon as a counter is not binding on this Court, and its holding that a claimant can recover, through OPA, for both wreck removal and oil clean-up has been challenged by other authorities.  *Compare Glynn Cnty., Ga. v. GL NV24 Shipping Inc.*, No. 2:22-CV-28, 2023 WL 5671934, at *18-20 (S.D. Ga. Sep. 1, 2023), *with In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371, 383 (5th Cir. 2006).  At any rate, that disputable holding is immaterial because Nautical *has* been paid by decedent Allan as a matter of contract. *See* Pl.'s Ex. 3, at 1-3.

14

of the vessels' hulls as well as the smaller charred debris coating the surface of the marina's waters. The gasoline from the six gasoline-powered vessels would have, first of all, likely burned off before the commencement of the clean-up operation. Tr. 84:16-19. That leaves only the 180 gallons of diesel fuel that spilled from the Allan's Alley and an indeterminate amount of engine oil that may or may not have leaked from the seven fire-damaged vessels' internal systems—the latter of which could not have been much given that the wreckage of at least one boat still had to be drained of oil after being hauled ashore. JPTO 6; Tr. 179:23-180:13, 251:6-22, 391:13-392:25.

It bears repeating that, having made its own observations of the wreckage, the spilled oil, and the potential for additional spillage, USCG evidently did not deem a response beyond wreck removal and containment and removal of the limited spill that could be associated with the wrecked vessels needed. Outside of monitoring the clean-up efforts and giving guidance on the appropriate actions to take, USCG seems to have been content to step back and let Nautical take the lead. *See* Tr. 255:19-256:9; Pl.'s Ex. 1WW at 22. Once at the helm, moreover, Nautical apparently did not believe that this incident warranted any special treatment either. Rather, Nautical ended up largely conducting its conventional wreck removal services and pollution remediation work simultaneously. *See* Tr. 562:4-564:7.

In light of this evidence, Nautical's September 1, 2016 invoice to Allan should, in fact, be read as covering both types of services. Unlike the other invoices, it does not contain any line-item billing that could shed light on what is being charged. While the others all cabin themselves to the removal and disposal of specific vessels, Allan's invoice does not provide any description of the services covered by the charged fee. *Compare* Pl.'s Ex. 3, at 3, *with id.* at 5, 9, 13-15. That tracks Captain Bayley's testimony at trial that the agreed-upon price of $24,000 for the removal of the Allan's Alley was not calculated on a "per-foot" basis like the others but instead was simply

an amount that both sides were "comfortable" with.  Tr. 443:24-444:7.  One other invoice even explicitly excludes from its purview any "environmental impact" costs; Allan's, on the other hand, does nothing of the sort.  *Compare* Pl.'s Ex. 3 at 2-3, *with id.* at 14-15.  Allan's invoice also dates to the time of the clean-up operation itself, not long after USCG concluded its involvement in the situation and only a day before Eastern Environmental retrieved the 17 55-gallon drums containing the waste Nautical had gathered.  Pl.'s Ex. 1WW at 49-50; Pl.'s Ex. 13.  Meanwhile, the first of the three initial environmental remediation bills would not arrive for another three months, and when that bill did show up, it came not as a run-of-the-mill invoice like the one sent out on September 1, 2016 but rather as a demand for payment issued straight from Nautical's lawyer.  Tr. 449:9-450:20.

In its environmental bills, Nautical does lay claim to costs for actions taken after the date of Allan's September 1, 2016 invoice, primarily with respect to its containment watch schedule.  But even if the Executrix were liable generally for Nautical's removal costs, that liability would not extend to those charges.  The standard for assessing causation under OPA is murky, to say the least, and it is far from clear that the statute imported traditional notions of proximate cause.  *See, e.g.*, *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mex., on Apr. 20, 2010*, 808 F. Supp. 2d 943, 965-66 (E.D. La. 2011) (citing *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 702-03 (2011)).  Even under the looser test adopted by certain courts, however, the costs that Nautical claims to have incurred after August 25, 2016 are far too remote, attenuated, and unforeseeable to be recoverable.  On that day, Nautical told USCG that the job was finished and that only the hard boom would be left in the water, and USCG departed from the scene, effectively confirming that

the incident was over.[14]  Pl.'s Ex. 1WW at 49-50; *see* Tr. 692:20-693:7; *cf.* 40 C.F.R. § 300.320(b) (dictating that funding from the Oil Spill Liability Trust Fund shall end when job completion is announced by USCG's on-scene coordinator).  Indeed, the record is barren of any evidence that Nautical removed even a quart of oil from the marina waters after August 25, 2016.  *See* Pl.'s Ex. 1WW at 52-158.  No one could have reasonably anticipated, moreover, that the work to replace the dock would drag on for eight months due to an obscenely sluggish permitting process.  It also boggles the imagination that the dock, no matter how fire-damaged, could have absorbed so much oil, after the 17 55-gallon drums, all of the sorbent pads and booms used, and the drainage of the wrecks, that it would continue to release oil spilled by the seven fire-damaged vessels for months on end, especially when there is no evidence of Nautical ever needing to call Eastern Environmental, or any other company for that matter, back to pick up more oil-related waste after September 2, 2016.  *See* Pl.'s Ex. 13.

Indeed, Nautical's environmental billing is ridden with indicia of unreliability overall, making it an unsuitable basis for discrediting Lane's testimony and providing an entirely different ground for denying Nautical any recovery.  Revisions were made without any explanation, for example, to the first environmental bill, the one from December 12, 2016, four months after it was issued, adjusting the rate charged for select materials and inserting a 15% G&A charge.  *Compare* Def.'s Ex. A-2, at 1, *with* Def.'s Ex. B at 3.  In addition, the charges contained in the original set of environmental bills sent out between December 2016 and April 2017, Def.'s Exs. A-1, A-2, A-3, B, are frequently not commensurate with those in the "final" compiled version from May 2018, Pl.'s Exs. 1WW, 4.  The May 2018 invoice, for instance, adds a 30% G&A rate, despite the 15%

---

[14] Nor does it appear in the record that DEC took any further action after August 2016.  *See* Pl.'s Ex. 1WW at 15, 17 (last recorded mention of DEC in Nautical's status reports occurring on August 18, 2016).

G&A rate already charged in the earlier billing. Pl.'s Ex. 4. It also mysteriously drops charges for bi-weekly inspections allegedly made during the month of April 2017 that had been included in the initial trio of bills. *Compare* Def.'s Ex. A-3, *with* Pl.'s Ex. 1WW at 154-56. To top it all off, the May 2018 invoice is littered with unsupported fees, including charges for Nautical's van when it was parked at the marina and not being driven by any of Nautical's employees. *Compare* Pl.'s Ex. 1WW at 1-4, *with* Tr. 207:24-208:9. Even if there had been no wreck removal contract, Nautical could never have recovered on the basis of this flagrantly preposterous billing. It would have been impossible for the Court to discern the reasonable value of the services rendered, and Nautical accordingly would have failed in its obligation to prove that it was entitled to recover the amount of damages it claims in its amended complaint.

At bottom, the Court is drawn back to the sage analysis and opinion offered by Lane that, while Nautical may have been entitled to recover under OPA for the reasonable value of its oil spill remediation services, as is typical in the maritime industry and circumstances like the evidence shows existed here, the contract between Nautical and Allan, negotiated through Allan's insurer, included the cost of that remediation in the payment for the removal of the wreck of Allan's Alley. Stated differently, Nautical has already been compensated in full for its pollution remediation efforts on behalf of Allan and is entitled to recover nothing further against his estate. The fact that the contract also covered matters other than oil spill remediation is immaterial.

II.    Breach of Contract

Sandwiched between Nautical's OPA claim against the Executrix and Patchogue's cross-claim against the Executrix is Nautical's contract claim against Patchogue. The contract claim Nautical asserts against Patchogue is based upon Captain Kazmark's alleged promise that Patchogue would make up the shortfall for any remediation work performed at the marina and its

18

waters that was not paid by the owners of the fire-damaged vessels Nautical was retained to remove from the water.[15]  Nautical's alleged agreement with Patchogue qualifies as a "maritime contract." Its subject-matter, the clean-up of an active marina, is no different from that of the wreck removal contract, and its enforceability accordingly depends on the tenets of general maritime law.  *Norfolk*, 543 U.S. at 24-25, 27.  Under general maritime law, as with state-law actions, "[a] plaintiff seeking to recover for breach of contract must prove, 'by a preponderance of the evidence[:] (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by the defendant; and (4) damages to the plaintiff caused by that defendant's breach.'"  *Interglobo Customs Broker, Inc. v. Sunderland Bros. Co.*, No. 19-CV-5723 (GBD) (JLC), 2019 WL 5996281, at *5 (S.D.N.Y. Nov. 14, 2019) (quoting *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011)).

Even assuming that the agreement *is* valid, it is far from clear that Patchogue's end of the bargain has even been triggered yet.  Under Nautical's version of events, Patchogue promised to pay for Nautical's clean-up costs only to the extent that Nautical could not recover them from the individual boatowners' insurance companies.  *See* Tr. 489:15-25, 490:7-13.  At best, therefore, it was an obligation premised upon a condition precedent requiring the triggering contingency to have occurred before it had to be performed.  *See Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 305 (2d Cir. 2016) (applying New York law).  But that eventuality had not yet come to pass when Nautical first brought suit against Patchogue in

---

[15] In the context of Patchogue's potential liability, there are two housekeeping matters ripe for disposition.  First, no matter how much the parties emphasize it, the Court's statement in its December 31, 2022 Memorandum & Order that Nautical "must look to Patchogue for its recovery" is irrelevant, as it was made in the context of a quasi-contract claim which Nautical abandoned in the Joint Pre-Trial Order.  Dkt. No. 171, at 19; *see* JPTO 3.  Second, because this claim can be resolved on other grounds, the Court declines to address Patchogue's arguments regarding the releases issued by Nautical to some of the boatowners.

November 2018, as Nautical's efforts to collect from Allan, via this lawsuit, were still ongoing at the time. *See* Tr. 494:2-7. Only now, with the final resolution of the claims against Allan and his successor the executrix of his estate, has Patchogue's alleged covenant at last come due. In addition, even if *this* condition precedent had already been triggered, Captain Bayley's testimony suggests that Patchogue at most agreed, in the event of a shortfall in the payment of Nautical's remedial charges, to present a claim to its liability insurer and then, *only if* the claim was paid by the insurer, to turn those proceeds over to Nautical. *See* Tr. 489:23-25. In short, there would have in fact been a double contingency embedded in the agreement, entitling Nautical to nothing unless and until the second contingency, that is, receipt of claim payment from Patchogue's insurer, came to pass.

In any event, Nautical's breach-of-contract claim falls short elsewhere as well. Indeed, Nautical cannot even meet its burden of demonstrating, by a preponderance of the evidence, that Captain Kazmark actually agreed, as Nautical claims, that Patchogue would pick up the shortfall for any remedial work performed at the marina that was not covered by the respective insurers of the wrecked vessels. It is a promise, unlike Nautical's agreement to rebate to the marina 10% of the payments it received from the insurers in connection with the remedial work, for which there is no writing or other extrinsic evidence attesting to its existence.[16] *Compare* Pl.'s Ex. 14, *with* Tr. 489:15-25. All that Nautical offers to substantiate Captain Kazmark's alleged shortfall promise is Captain Bayley's testimony that he did actually assent to this claimed shortfall promise in the first place. Especially backlit by Nautical's billing for the remedial OPA work it claims to have

---

[16] The stipulation in the Joint Pre-Trial Order that Patchogue "entered into an agreement [with Nautical] for its [marina's] environmental remediation" cannot be relied upon to shore up Nautical's position. JPTO 6. It only reinforces the uncontested fact that an agreement of some sort was made; it does not speak at all to the specific contours of the agreement.

20

performed at the marina and in its waters which, with charity, may be best described as dubious, the Court finds Captain Bayley's testimony on this point incredible. What is much more believable is Captain Kazmark's version of Patchogue's agreement with Nautical. With Nautical having failed to establish its version of Captain Kazmark's promise by a preponderance of the evidence, therefore, its contract claim against Patchogue fails.

Conclusion

In accordance with the foregoing findings of fact and conclusions of law, judgment is for the executrix of Allan's estate and Patchogue on all claims asserted against them by Nautical. Patchogue's cross-claim against the Executrix is dismissed as moot.  Nautical's claim against Rodriguez is dismissed, having been withdrawn in the Joint Pre-Trial Order.  Nautical's claims against all other defendants and Patchogue's third-party complaint against third-party defendant International Marine Underwriters were all dismissed as a result of the Memorandum & Order entered on December 31, 2022.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

So Ordered.

Dated:  Brooklyn, New York
        August 5, 2026

                                        /s/ Eric N. Vitaliano
                                        ERIC N. VITALIANO
                                        United States District Judge

22